Nicole Owens
FEDERAL PUBLIC DEFENDER
Jonah J. Horwitz, Idaho Bar No. 10494
Mary E. Spears, Indiana Bar No. 27353-49
ASSISTANT FEDERAL DEFENDERS
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
Email: Jonah_Horwitz@fd.org
          Mary_Spears@fd.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **GERALD ROSS PIZZUTO, JR.** and **THOMAS EUGENE CREECH**, <br><br> Plaintiffs, <br><br> v. <br><br> **BREE DERRICK**, Director, Idaho Department of Correction, in her official capacity, **RANDY VALLEY**, Warden, Idaho Maximum Security Institution, in his official capacity; **LIZ NEVILLE**, Chief, Division of Prisons, in her official capacity, <br><br> Defendants. | Case No. _____ <br><br> **CAPITAL CASE** <br><br> **COMPLAINT FOR EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |

COMPLAINT - Page 1

## I.    Nature of the Action

1.    Plaintiffs Gerald Ross Pizzuto, Jr. and Thomas Eugene Creech are death row inmates in Idaho[1] who bring this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc et seq.

2.    The plaintiffs are raising claims for violations and threatened violations of their constitutional and statutory rights in connection with the State's efforts to execute them.

3.    Evolving standards of decency render Idaho House Bill 37 (HB 37) unconstitutional because it created the only statute in the country to make the firing squad the primary, mandatory method of execution for a jurisdiction.

4.    HB 37 also violates the plaintiffs' religious rights because Idaho made the firing squad mandatory without a compelling governmental interest when that method prevents spiritual advisors from being present with inmates at their executions and making physical contact with them as they pass on.

5.    The plaintiffs hereby seek injunctive and declaratory relief prohibiting the defendants from seeking or preparing to execute them by firing squad.

---

[1] The plaintiffs refer to Idaho as "Idaho," "the State of Idaho," and "the State." Likewise, throughout this complaint, the plaintiffs refer to the defendants, variously, as "the defendants," "the State," "IDOC," and other phrases, as appropriate. Their use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

COMPLAINT - Page 2

## II.   Justiciable Case or Controversy

6.   For the reasons set forth below, absent judicial intervention, the plaintiffs will be executed in violation of their constitutional and statutory rights.

7.   There is a real and justiciable case or controversy between the parties.

## III.   Jurisdiction and Venue

8.   This action arises under 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc.

9.   The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violation), 2201(a) (declaratory relief), and 2202 (further relief).

10.   The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho or are appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

11.   Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims have occurred, are occurring, or will occur in the District of Idaho.

12.   Venue is further proper because, upon information and belief, the defendants all reside in the District of Idaho.

## IV.   Parties

13.   The plaintiffs are persons within the jurisdiction of the State of Idaho.

14.   The plaintiffs are inmates under the supervision of the Idaho Department of Correction ("IDOC").

COMPLAINT - Page 3

15. The plaintiffs are confined at the Idaho Maximum Security Institution ("IMSI").

16. The plaintiffs are under sentence of death.

17. The defendants are state officials responsible for developing, overseeing, and/or implementing death by firing squad in Idaho.

18. Defendant Bree Derrick ("Director Derrick") is the Director of IDOC.

19. Director Derrick is responsible under HB 37 for certifying the availability of the firing squad, by affidavit to the court that issued the death warrant, within five days of the warrant's issuance.

20. Director Derrick is responsible under HB 37 for approving the procedures to be used in any execution performed by IDOC.

21. Defendant Randy Valley ("Warden Valley") is the Warden of IMSI.

22. Warden Valley is the official executioner for inmates in Idaho state custody.

23. Defendant Liz Neville ("Chief Neville") is the Chief of the Division of Prisons for IDOC.

24. On information and belief, Chief Neville will have significant supervisory responsibilities in connection with the firing squad, including overseeing personnel, acquiring and maintaining equipment, and so forth.

25. Upon information and belief, the plaintiffs and the defendants are all United States citizens.

26. The defendants are all officials of the State of Idaho.

COMPLAINT - Page 4

27.    All of the actions that have been and will be taken by the defendants towards executing the plaintiffs, and any other actions at issue in this complaint, were or will be taken under color of state law.

28.    The defendants are all sued in their official capacities.

## V.    General Factual Allegations

29.    The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

30.    By statute, the firing squad will be the primary method of execution in Idaho beginning July 1, 2026.

31.    By statute, the IDOC Director has the power and responsibility to approve the firing squad protocols and methods, which includes the authority to approve the materials and procedures used in an execution.

32.    Upon information and belief, there is a reasonable likelihood that the plaintiffs will face warrants for their executions by firing squad at some point after the firing squad takes effect as Idaho's primary method of execution on July 1, 2026.

## VI.    Claims

### A.    Claim One—Idaho's Use of the Firing Squad Violates the Eighth Amendment.

#### 1.    HB 37 is inconsistent with evolving standards of decency.

33.    The plaintiffs repeat and reallege each and every statement and allegation set forth throughout this complaint.

34.    The plaintiffs allege that evolving standards of decency make it clear that Idaho is acting unconstitutionally as the only jurisdiction in the United States that will use the firing squad as its primary, mandatory method of execution, and

COMPLAINT - Page 5

thus as the only jurisdiction that will force every person on its death row to experience the violent and gruesome death that is inflicted by multiple shots from high-velocity rifles at close range.

35. The Eighth Amendment to the United States Constitution, as incorporated against the states by the Fourteenth Amendment, prohibits "cruel and unusual punishments." U.S. Const. Amend. VIII; U.S. Const. Amend. XIV.

36. The United States Supreme Court has "established the propriety and affirmed the necessity of referring to the evolving standards of decency that mark the progress of a maturing society to determine which punishments are . . . cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 561 (2005).[2]

37. When considering the country's evolving standards of decency, the Supreme Court is guided by factors that include "objective indicia of society's standards, as expressed in legislative enactments and state practice with respect to executions," *id.* at 563, "[s]tatistics about the number of executions," *Kennedy v. Louisiana*, 554 U.S. 407, 433 (2008), and "the consistency of the direction of change," *Atkins v. Virginia*, 536 U.S. 304, 315 (2002).

38. First, "legislative enactments and state practice with respect to executions," *Roper*, 543 U.S. at 563, illustrate that evolving standards of decency forbid Idaho's use of the firing squad as its primary, mandatory method of execution.

---

[2] In this complaint, unless otherwise noted, all internal quotation marks are omitted, all emphasis is added, and all citations are cleaned up.

COMPLAINT - Page 6

39. When HB 37 takes effect, Idaho will be the only state in the country that uses the firing squad as its primary, mandatory method of execution.

40. That fact on its own proves that evolving standards of decency render HB 37 unconstitutional.

41. The other states that *authorize* the firing squad do not change that result.

42. Those states only approve the use of the firing squad as a backup or alternative method of execution.

43. Only seven states authorize the firing squad as an available method of execution.

44. Those are Idaho, Oklahoma, Utah, South Carolina, Florida, North Carolina, and Mississippi.

45. In Oklahoma, the firing squad is available as the last of three backup methods of execution. *See* Okla. Stat. tit. 22, § 1014.

46. Oklahoma law allows for the use of the firing squad only if all three of the other authorized methods—lethal injection (the primary method), nitrogen hypoxia, and electrocution, in that order—are determined to be unconstitutional or are otherwise unavailable. *See id.*

47. By placing the firing squad last in a hierarchical list of available execution methods and allowing it to be used only if all three of the preceding methods on the list are unconstitutional or unavailable, Oklahoma has demonstrated its desire to avoid firing squad executions.

COMPLAINT - Page 7

48.    That is, in Oklahoma the firing squad is the method of last resort.

49.    This is further supported by the fact that, on information and belief, Oklahoma does not have a published execution protocol for any method other than lethal injection.

50.    Oklahoma's "legislative enactments and state practice," *Roper*, 543 U.S. at 563, are accordingly in stark contrast with Idaho's use of the firing squad as its primary, mandatory method of execution.

51.    In Utah, the firing squad is available as a secondary method in case lethal injection is either found unconstitutional by a court or is unavailable for practical reasons, or if a court holds that a defendant has a right to be executed by firing squad. *See* Utah Code Ann. § 77-18-113(2)(a).

52.    Similar to Oklahoma, Utah's placement of the firing squad as a secondary option in a hierarchical list facially demonstrates its desire to avoid firing squad executions and its view of the firing squad as a method of last resort.

53.    Utah's legislative history concerning the firing squad further underscores the state's discomfort with this method, and the corresponding distance between its practices and those of Idaho.

54.    In 2004, the Utah legislature removed the firing squad as an available method of execution, and instead made lethal injection the state's primary and only method.

55.    This removal was motivated by legislators' fears that the firing squad had brought Utah unfavorable international attention.

COMPLAINT - Page 8

56.     The firing squad was thus not available in Utah until the legislature reinstated it as the state's backup execution method in 2015, motivated in part by legislators' worries about a shortage of lethal injection drugs.

57.     Utah Governor Gary Herbert stated during this period that he preferred lethal injection and found the firing squad "a little bit gruesome," but supported the 2015 bill because a backup option was necessary.

58.     Utah's "legislative enactments and state practice," *Roper*, 543 U.S. at 563, are accordingly distinct from Idaho's choice of the firing squad as its primary, mandatory method of execution.

59.     In South Carolina, the firing squad was made available by a 2021 bill.

60.     The current South Carolina statute makes electrocution the primary method of execution in the state. *See* S.C. Code Ann. § 24-3-530.

61.     However, the statute allows the inmate to alternatively choose the firing squad. *See id.*

62.     South Carolina's statute displays a preference for electrocution.

63.     By the same token, the statute exhibits a preference against the firing squad.

64.     Furthermore, South Carolina's decision to authorize the firing squad only at the inmate's election places its statute in a far different category than Idaho's, which gives the prisoner no agency in the matter.

65.     In its evolving standards cases, the Supreme Court has emphasized that "the basic concept underlying the Eighth Amendment is nothing less than the

COMPLAINT - Page 9

dignity of man," *Trop v. Dulles*, 356 U.S. 86, 100 (1958) (plurality op.), and that "[e]volving standards of decency must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule," *Kennedy*, 554 U.S. at 420.

66.    Given the dignity interests protected by the Eighth Amendment, there is a great difference between a statute (like South Carolina's) that gives the inmate the option of choosing the firing squad and a statute (like Idaho's) that forces the firing squad on the inmate.

67.    A statute providing the inmate with a choice in the method is more consistent with dignity than a statute giving no choice.

68.    Legislative leaders in South Carolina made statements emphasizing that the 2021 addition of the firing squad to the state's execution statute as an alternate method was motivated only by a shortage of lethal injection drugs, and that the firing squad was not their preferred method.

69.    For example, South Carolina Senator Greg Hembree, the co-sponsor of the bill that added the firing squad to the state's execution statute, acknowledged that motivation and stated that among the bill's two backup options, lethal injection is a more humane method than the firing squad.

70.    In Florida, "[a] death sentence shall be executed by lethal injection, unless the condemned affirmatively elects to be executed by electrocution." Fla. Stat. § 922.105(1).

COMPLAINT - Page 10

71. However, in 2025, the Florida legislature enacted a statute that also allows for execution by any "method not deemed unconstitutional." Fla. Stat. § 922.10.

72. The firing squad has not been deemed unconstitutional and is thus theoretically available to be used in Florida as a result of this 2025 change.

73. That said, Florida has demonstrated a preference for lethal injection as its primary method with electrocution as the only backup explicitly referenced by statute.

74. Consequently, Florida has demonstrated a preference against the firing squad, a method its statutes nowhere mentions.

75. In Florida, the firing squad would only be permitted if electrocution or lethal injection were "held to be unconstitutional" or if the acquisition of lethal injection chemicals became "impossible or impractical." Fla. Stat. § 922.105(3).

76. It follows that the firing squad in Florida is a method of last resort.

77. In North Carolina, lethal injection is the primary method of execution. *See* N.C. Stat. § 15-188(a).

78. If lethal injection is declared unconstitutional or found to be unavailable, North Carolina officials may choose another method. *See* N.C. Stat. § 155-188(b).

79. The North Carolina statute does not refer explicitly to the firing squad.

80. Thus, North Carolina is essentially in the same category as Florida.

COMPLAINT - Page 11

81.    That is, the firing squad is available in North Carolina only as a method of last resort.

82.    In Mississippi, the firing squad is available as an alternative method of execution. Miss. Code Ann. § 99-19-51(1).

83.    In 2017, the Mississippi legislature passed a bill adding nitrogen hypoxia, electrocution, and the firing squad as available methods of execution to supplement lethal injection, which was previously the state's only available method.

84.    Under the 2017 law, Mississippi death row inmates were able to choose between these four methods for their execution.

85.    That remained true until 2022, when a new Mississippi law instead placed that decision in the hands of the Commissioner of Corrections. *See id.*

86.    The Commissioner may choose from lethal injection, nitrogen hypoxia, electrocution, or the firing squad. *See id.*

87.    Mississippi's statute lists the firing squad fourth on the list of the four available methods. *See id.*

88.    Notably, the Mississippi statute includes several other specific clauses relating to lethal injection executions but none concerning the firing squad. *See generally* § 99-19-51.

89.    Mississippi's legislature has thereby expressed its preference for lethal injection and its view of the firing squad as a less-desirable alternative.

COMPLAINT - Page 12

90.    Consistent with that preference, the Commissioner of Corrections has chosen lethal injection for the two people executed in Mississippi since the 2022 law took effect.

91.    Mississippi's "legislative enactments and state practice," *Roper*, 543 U.S. at 563, therefore also differ from Idaho's use of the firing squad as its primary, mandatory method of execution.

92.    In sum, Idaho is entirely alone even among the seven states that authorize the firing squad as an available method of execution.

93.    Moreover, with the exception of Mississippi, these other six states authorize the firing squad solely as a backup method.

94.    In other words, in Oklahoma, Utah, South Carolina, Florida, and North Carolina, the firing squad can only be used if the state is unable to implement a preferred method or if the inmate opts for the firing squad.

95.    Put another way, Idaho and Mississippi are the only two states in the country where the firing squad could be forcibly imposed on an inmate despite the availability of another method.

96.    Of those two, Idaho is the only state where the firing squad *must* be forcibly imposed on an inmate despite the availability of another method.

97.    A practice that is allowed in only two states is a practice inconsistent with the evolving standards of decency.

COMPLAINT - Page 13

98.    Idaho's execution history further demonstrates how its statute was not, unlike these others, motivated by practical problems with carrying out other methods.

99.    Former IDOC Director Josh Tewalt stated in a declaration dated March 18, 2025 and filed in this Court that "IDOC will be able to acquire the chemicals necessary to carry out . . . execution by lethal injection within 30 days of the issuance of . . . [a] death warrant."

100.    In the same declaration, Director Tewalt swore that IDOC had "no reason to believe that it will experience any issue that would prevent [Mr. Pizzuto's] execution" by lethal injection.

101.    Six days after Director Tewalt signed this declaration, Governor Brad Little signed into law the bill making the firing squad Idaho's primary, mandatory method of execution effective July 1, 2026.

102.    Lethal injection was Idaho's primary, mandatory method of execution prior to this statutory change.

103.    It is therefore indisputable that Idaho affirmatively selected the firing squad to replace lethal injection as its primary, mandatory method of execution despite having confirmed access to lethal injection chemicals at the time of its statutory change.

104.    Idaho is the only state in the country that is prepared to involuntarily execute an inmate by firing squad even though it is demonstrably capable of carrying out executions by another method.

COMPLAINT - Page 14

105.    That is the strongest possible evidence of a violation of the evolving standards of decency.

106.    The Supreme Court also considers the federal government's laws and practices when evaluating national consensus in its evolving standards cases. *See Kennedy*, 554 U.S. at 422–26.

107.    The United States government counts as yet another jurisdiction that supports the plaintiffs' claim, because federal death sentences are carried out "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596.

108.    The federal government's practices regarding execution methods simply mirror the landscape of state statutes described above, in which Idaho is the sole outlier.

109.    Additionally, Idaho has no federal death row inmates, so there is simply no person who can be executed by the federal government under Idaho's statute, regardless of the methods the State employs.

110.    It is also instructive that the United States military, a division of the federal government that exists to kill with weapons of war, has rejected the firing squad method of execution for its death-sentenced soldiers and instead uses lethal injection.

111.    In sum, forty-nine states, Washington, D.C., and the federal government do not believe the government should unnecessarily force death row inmates to be executed by firing squad.

COMPLAINT - Page 15

112. That number far exceeds the number of jurisdictions the Supreme Court has found to demonstrate national consensus when it has struck down execution practices on Eighth Amendment grounds in its evolving standards cases.

113. Therefore, by the criteria of "legislative enactments and state practice," *Roper*, 543 U.S. at 563, upon which the Supreme Court has long relied, it is evident that Idaho's planned use of the firing squad as its primary, mandatory method of execution is unconstitutional in the context of evolving standards of decency.

114. Second, "[s]tatistics about the number of executions," *Kennedy*, 554 U.S. at 433, provide further proof that HB 37 is unconstitutional on evolving standards grounds.

115. Of the 1,654 people executed in the United States since 1976, the year the Supreme Court effectively reinstated the death penalty through its ruling in *Gregg v. Georgia*, 428 U.S. 153 (1976) (plurality op.), only six people—representing just .36 percent of this total—have been executed by firing squad.

116. That bare statistic supports the plaintiffs' evolving-standards claim.

COMPLAINT - Page 16

117.   The following graph reflects how disproportionately unusual firing squad executions are in the modern era of the American death penalty:



118.   Even those six executions do not show any support in the modern era for Idaho's approach.

119.   That is because all six of those inmates (Stephen Bryant, Mikal Mahdi, Brad Sigmon, Ronnie Gardner, John Taylor, and Gary Gilmore) *chose* the firing squad themselves.

120.   Put another way, not a single inmate in America in the modern era has been forced by a state to be executed by firing squad.

121.   That is the strongest possible evidence that HB 37 violates the evolving standards of decency.

COMPLAINT - Page 17

122.   What is more, the six firing squad executions since 1976 have been highly localized, occurring in only two states: Utah and South Carolina.

123.   The geographical isolation of firing squad executions in the modern era supports the plaintiffs' evolving-standards theory.

124.   The full history of executions across the United States likewise underlines the extremely limited and localized use of the firing squad.

125.   The Espy File documents all executions that took place in the American colonies, territories, and the United States from 1608 through 2002, excluding military executions.

126.   The Espy File lists a total of 15,269 executions in that period.

127.   The Espy File lists 143 firing squad executions in that period.

128.   Since the last December 2002 execution listed in the Espy File, four firing squad executions have occurred.

129.   Therefore, the total number of firing squad executions in United States history is 147.

130.   Since the last December 2002 execution listed in the Espy File, there have been 834 executions in the United States.

131.   Accordingly, the total number of executions in United States history is 16,103.

132.   The 147 total firing squad executions consequently represent only .91 percent of the total number of executions in United States history.

133.   That small percentage is encapsulated by the following graph:

COMPLAINT - Page 18



134.    The firing squad statistics in the four states other than Utah and South Carolina that currently authorize the firing squad as an available method of execution further demonstrate its limited and localized use.

135.    Idaho, Florida, Mississippi, and North Carolina have never executed anyone by firing squad, dating back to 1608.

136.    Oklahoma has not executed anyone by firing squad since 1899.

137.    Providing even more proof of the method's localized nature, 73.15 percent of the firing squad executions in United States history—109 of the 149 total—have occurred in only four states: Utah (40), California (29), Oklahoma (25), and Massachusetts (15).

138.    These four states are the only states that have executed more than six people by firing squad in their history.

COMPLAINT - Page 19

139.    Utah, South Carolina, and Nevada are the only states that have executed anyone by firing squad since 1900.

140.    Utah and South Carolina are the only states that have executed anyone by firing squad since 1914.

141.    Utah was the only state that executed anyone by firing squad between 1914 and 2024, and has executed only three people by this method since 1961.

142.    The United States government has never executed a federal death row inmate by firing squad.

143.    The United States military last executed a soldier by firing squad in 1945.

144.    In the modern era, the firing squad has been even more geographically isolated.

145.    The firing squad has been used only three times in two states each since 1976: Utah and South Carolina.

146.    That points to an exceedingly limited scope geographically for the method, as reflected by the following graph, which displays execution totals for certain high-volume jurisdictions as well as Idaho, Utah, and South Carolina:



147.    The extreme rarity and localized nature of executions by firing squad over the course of United States history speaks to the national consensus against states using this method as their primary, mandatory method of execution.

148.    Therefore, by the criteria the Supreme Court uses to evaluate "[s]tatistics about the number of executions," *Kennedy*, 554 U.S. at 433, it is clear that Idaho's planned use of the firing squad as its primary, mandatory method of execution is unconstitutional in the context of evolving standards of decency.

149.    Finally, "the consistency of the direction of change," *Atkins*, 536 U.S. at 315, further demonstrates that HB 37 is unconstitutional.

150.    The self-evident unpopularity of the firing squad, as corroborated by legislative enactments, state practice, and statistics, illustrates that all the change on every relevant front has been overwhelmingly moving against the firing squad for over a century.

COMPLAINT - Page 21

151.   A practice need not be completely unprecedented and non-existent for the Supreme Court to find that it violates evolving standards of decency.

152.   As such, the severely limited use of the firing squad in South Carolina and Utah in the twenty-first century is far from disqualifying given the otherwise-consistent direction of change and given the fact that *no* states have been moving toward the firing squad as a mandatory, primary method of execution—which is what HB 37 did.

153.   The Supreme Court has found that the historical transition from one method of execution to another over the course of the nineteenth and twentieth centuries was motivated by a search for "a more humane way to carry out death sentences." *Glossip v. Gross*, 576 U.S. 863, 868 (2015).

154.   During the course of that history, the firing squad was abandoned by the overwhelming majority of American jurisdictions by the time the modern era of the death penalty began. *See id.*

155.   Therefore, the re-adoption of the firing squad cannot be approved of as the product of a search for a more humane method of execution.

156.   In overview, the primary factors the Supreme Court uses to guide its decisions in evolving standards cases all prove that there is a national consensus against states using the firing squad as their primary, mandatory method of execution.

157.   As such, HB 37 is inconsistent with the evolving standards of decency and violates the Eighth Amendment.

COMPLAINT - Page 22

### 2.    The alternative to the firing squad.

158.    The plaintiffs understand their pleading burden under the alternative method of execution requirements outlined by the Supreme Court in *Bucklew v. Precythe*, 587 U.S. 119, 133–40 (2019), and *Glossip*, 576 U.S. at 877–79, to be the identification of a method of execution that does not suffer from the constitutional infirmity of the method they challenge.

159.    The plaintiffs identify lethal injection as a method of execution that cures the constitutional infirmity of a state violating evolving standards of decency by using the firing squad as its primary, mandatory method of execution.

160.    Lethal injection is more common than the firing squad by a tremendous order of magnitude, as twenty-six of the twenty-seven states that retain the death penalty currently use lethal injection as their primary method of execution.

161.    The plaintiffs do not assert that lethal injection is a more humane method than the firing squad and are not "proposing" that the defendants use lethal injection; they are only identifying an alternative in accordance with the pleading requirement imposed by law.

162.    Lethal injection, which is currently Idaho's primary method of execution and will be Idaho's secondary method when the new version of Idaho Code § 19-2716 takes effect on July 1, 2026 pursuant to HB 37, is an available method of execution for the defendants.

163.    Lethal injection, which is currently Idaho's primary method of execution and will be Idaho's secondary method when the new version of Idaho Code

COMPLAINT - Page 23

§ 19-2716 takes effect on July 1, 2026, is a readily implemented method of execution for the defendants.

**B.     Claim Two—HB 37 Violates RLUIPA.**

164.    Each and every statement and allegation set forth above is incorporated here as if fully rewritten.

165.    For the reasons that follow, HB 37 violates RLUIPA.

**1.     Mr. Pizzuto's religious beliefs**

166.    Mr. Pizzuto was raised in the Roman Catholic faith.

167.    While incarcerated, Mr. Pizzuto sought out a Christian spiritual advisor.

168.    Mr. Pizzuto met his current spiritual advisor, Emil Kolar, over thirty-four years ago.

169.    During the course of their decades-long friendship, Mr. Pizzuto has relied on Mr. Kolar for spiritual guidance, comfort, and restoration.

170.    In the fall of 1989, Mr. Kolar initiated the process of becoming Mr. Pizzuto's spiritual advisor at his request.

171.    Since then, the two men have corresponded through letters and Mr. Kolar has made many trips to IMSI to meet with Mr. Pizzuto and provide him with spiritual encouragement.

172.    In 1996, Mr. Pizzuto requested a Christian baptism.

173.    Mr. Kolar handled all of the arrangements for the baptism, including liaising with IMSI, and he was present during the ceremony, which was held at the prison.

COMPLAINT - Page 24

174. Mr. Kolar has been approved by IMSI for contact visits with Mr. Pizzuto as his spiritual advisor.

175. For years, Mr. Kolar has planned to be there for Mr. Pizzuto in the time leading up to and during his execution to provide him with the solace he will need in his final hours.

176. Mr. Pizzuto has a sincerely held belief that Mr. Kolar's presence by his side during his execution in the chamber is necessary to maintain Mr. Pizzuto's spiritual fortitude and well-being as Mr. Pizzuto crosses the passage between the realm of the living to that of the dead.

177. Mr. Pizzuto has a sincerely held belief that it is necessary for his spiritual fortitude and well-being that Mr. Kolar lay hands on him during his execution.

178. Mr. Pizzuto has a sincerely held belief that it is necessary for his spiritual fortitude and well-being that Mr. Kolar engage in audible prayer with him during his execution.

179. Death warrants were signed for Mr. Pizzuto in May 2021, November 2022, and February 2023.

180. When death warrants were signed for Mr. Pizzuto in 2021–2023, he intended to rely on Mr. Kolar as his spiritual advisor in connection with each scheduled execution.

COMPLAINT - Page 25

181.    As described in more detail below, IDOC approved Mr. Kolar to serve as his spiritual advisor at his most recently scheduled execution, in 2023. *See infra* at Part VI.B.3.

182.    The Catholic tradition involves a priest audibly praying "the liturgy of Viaticum" when a person is in danger of death.

183.    If Mr. Pizzuto were executed by lethal injection, he would ask for Mr. Kolar to be present with him in the chamber.

184.    If Mr. Pizzuto were subjected to lethal injection, he would ask for Mr. Kolar to lay hands on him during the execution.

185.    If Mr. Pizzuto were subjected to lethal injection, he would ask for Mr. Kolar to engage in audible prayer with him during the execution.

186.    Mr. Kolar would agree at a lethal injection execution to be present with Mr. Pizzuto in the chamber.

187.    Mr. Kolar would agree at a lethal injection execution to lay hands on Mr. Pizzuto.

188.    Mr. Kolar would agree at a lethal injection execution to audibly pray with Mr. Pizzuto.

189.    Mr. Pizzuto has a sincerely held belief that it is necessary for his religious well-being that a spiritual advisor be present with him in the chamber during his execution.

190.    Mr. Pizzuto has a sincerely held belief that it is necessary for his religious well-being that a spiritual advisor lay hands on him during his execution.

191. Mr. Pizzuto has a sincerely held religious belief that it is necessary for his religious well-being that a spiritual advisor engage in audible prayer with him during his execution.

### 2. Mr. Creech's religious beliefs

192. Mr. Creech is Christian.

193. As a child, Mr. Creech attended Baptist services.

194. Throughout his life, Mr. Creech has maintained a belief in Jesus Christ.

195. Mr. Creech has expressed his devotion to Jesus in many different forms.

196. Over decades, Mr. Creech has written numerous poems about Jesus and about his faith.

197. For example, a 2011 poem entitled "The Family of God" is dedicated to Jesus and encourages the reader to be "guided by God's powers above."

198. Mr. Creech has formed significant relationships with others based on their shared Christianity.

199. In 2010, a group from the United Methodist Church visited Mr. Creech after then-IDOC Director Brent Reinke chose him to meet with the gathering.

200. At the end of the visit, Bishop Bob Hoshibata of the Oregon-Idaho Conference of the United Methodist Church led the group in a prayer.

201. Donna Boe, a former Idaho state legislator, was also at the visit, along with her husband, pediatrician Roger Boe.

COMPLAINT - Page 27

202. In addition to serving as a legislator, Ms. Boe has spent time as a member of the General Conference for the United Methodist Church, an elected position representing the entire conference to the national body.

203. The Boes would go on to maintain a friendship with Mr. Creech for years afterwards.

204. Over the course of their friendship, the Boes visited Mr. Creech a number of times.

205. The Boes have prayed with Mr. Creech many times over the years.

206. Mr. Creech's spiritual advisor is Brian Thom.

207. From 2008 until 2022, Mr. Thom was the Bishop of Idaho for the Episcopal Church.

208. IDOC approved Bishop Thom as Mr. Creech's spiritual advisor in 2023.

209. Since then, Bishop Thom and Mr. Creech have had a number of visits and phone calls.

210. On January 30, 2024, a death warrant was signed for Mr. Creech, scheduling his execution for February 28, 2024.

211. In the month leading up to the execution, Bishop Thom visited Mr. Creech several times to pray with him and to provide him with spiritual comfort.

212. IDOC allowed Bishop Thom to be with Mr. Creech in the execution chamber on February 28, 2024.

213. Bishop Thom was with Mr. Creech in the execution chamber on February 28, 2024.

COMPLAINT - Page 28

214. IDOC attempted to execute Mr. Creech on February 28, 2024.

215. During the attempted execution, Bishop Thom was the only person in the chamber who was there to support Mr. Creech.

216. Every other person in the chamber was there to facilitate Mr. Creech's execution.

217. The execution team was unable to find a usable vein on February 28, 2024.

218. As a result, the attempted execution was called off.

219. If a usable vein had been found, Bishop Thom would have laid hands on Mr. Creech during the execution.

220. If a usable vein had been found, Bishop Thom would have audibly prayed for and with Mr. Creech during the execution.

221. On October 16, 2024, another death warrant was signed for Mr. Creech, scheduling his execution for November 13, 2024.

222. Bishop Thom planned to attend the November execution as Mr. Creech's spiritual advisor so that he could lay hands on him and pray audibly with him at the time of his death.

223. If Mr. Creech were executed by lethal injection in the future, he would ask for Bishop Thom to be present again with him in the chamber.

224. If Mr. Creech were subjected to lethal injection in the future, he would ask for Bishop Thom to lay hands on him during the execution.

COMPLAINT - Page 29

225. If Mr. Creech were subjected to lethal injection in the future, he would ask for Bishop Thom to engage in audible prayer with him during the execution.

226. Bishop Thom would agree at a future lethal injection execution to be present with Mr. Creech in the chamber.

227. Bishop Thom would agree at a future lethal injection execution to lay hands on Mr. Creech.

228. Bishop Thom would agree at a future lethal injection execution to audibly pray with Mr. Creech.

229. Mr. Creech has a sincerely held belief that it is necessary for his religious well-being that a spiritual advisor be present with him in the chamber during his execution.

230. Mr. Creech has a sincerely held belief that it is necessary for his religious well-being that a spiritual advisor lay hands on him during his execution.

231. Mr. Creech has a sincerely held belief that it is necessary for his religious well-being that a spiritual advisor engage in audible prayer with him during his execution.

### 3.    IDOC's policy on spiritual advisors and lethal injection

232. On October 11, 2024, IDOC's then-Director Josh Tewalt approved a new protocol for execution procedures, denominated version 5.0 of control number 135.02.01.001 (SOP 135).

233. SOP 135 describes the process IDOC will use for a lethal injection execution.

COMPLAINT - Page 30

234. Lethal injection was the only method of execution that Idaho authorized at the time SOP 135 was approved.

235. SOP 135 permits the spiritual advisor to be in the execution chamber with the inmate during the execution "if approved by the IMSI Warden."

236. On March 6, 2023, then-Director Tewalt signed a declaration that was filed in this Court in *Pizzuto v. Tewalt*, No. 1:21-cv-267.

237. In that declaration, then-Director Tewalt stated that he was approving Mr. Pizzuto's request to have his spiritual advisor, Mr. Kolar, by his side in the execution chamber and to offer "in person audible prayer" and "pastoral prayer" as Mr. Pizzuto "crosses the passage from this world to the next" in his upcoming lethal injection execution.

238. Specifically, then-Director Tewalt permitted the spiritual advisor "to touch Mr. Pizzuto during the execution by placing his hand on Mr. Pizzuto's shoulder until entry of the Ada County Coroner into the execution chamber."

239. Under SOP 135, the Coroner does not enter the chamber until it is time to pronounce the inmate's death.

240. Pursuant to then-Director Tewalt's declaration, Mr. Kolar would also be "permitted to pray silently over and with Mr. Pizzuto" in the execution chamber until his passing.

241. Then-Director Tewalt indicated that he had "revised SOP 135" through his declaration to allow Mr. Pizzuto those accommodations.

COMPLAINT - Page 31

242.   As then-Director Tewalt explained, the accommodations were made "in light of the Supreme Court's opinion in *Ramirez v. Collier*."

243.   In *Ramirez v. Collier*, 595 U.S. 411 (2022), the Supreme Court concluded that a death-row inmate was likely to succeed on his claim that Texas was violating his religious rights under RLUIPA and the First Amendment by forbidding his spiritual advisor from laying hands on him and engaging in audible prayer during his lethal injection execution.

244.   Federal Defender Services of Idaho ("FDSI") represented Mr. Pizzuto in connection with his challenge to the spiritual-advisor provisions of IDOC's execution policies.

245.   In addition, FDSI took the lead on handling the legal issues related to Mr. Creech's death warrants over the last several years.

246.   It was FDSI's understanding that IDOC was prepared to allow Bishop Thom to touch Mr. Creech during his execution in the manner described above for the death warrants issued in January and October 2024.

247.   It was FDSI's understanding that IDOC was prepared to allow Bishop Thom to engage in audible prayer with Mr. Creech during his execution in the manner described above for the death warrants issued in January and October 2024.

248.   Thus, if the plaintiffs were executed by lethal injection in Idaho, their spiritual advisors would be allowed to be present with them in the chamber, lay hands on them, and engage in audible prayer during their executions.

COMPLAINT - Page 32

### 4.     HB 37 substantially burdens religious exercise.

249.    Under RLUIPA, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government shows that the burden is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

250.    As set forth above, the presence of a spiritual advisor in the chamber during an execution is a religious exercise. *See supra* at Part VI.B.1, 2.

251.    There is a history of spiritual advisors being present alongside inmates during their executions.

252.    The laying on of hands by a spiritual advisor on the inmate during an execution is a religious exercise.

253.    There is a history of spiritual advisors laying hands on inmates during executions.

254.    A spiritual advisor's audible praying with an inmate during an execution is a religious exercise.

255.    "[T]here is a rich history of clerical prayer at the time of a prisoner's execution, dating back well before the founding of our Nation." *Ramirez*, 595 U.S. at 427.

256.    Numerous lethal injection executions have taken place without incident in which spiritual advisors have been present in the chamber.

COMPLAINT - Page 33

257.    Numerous lethal injection executions have taken place without incident in which spiritual advisors have laid hands on inmates.

258.    Numerous lethal injection executions have taken place without incident in which spiritual advisors have engaged in audible prayer with the inmate at the time of death.

259.    HB 37 imposes a substantial burden on that religious exercise by imposing a mandatory firing squad.

260.    The firing squad makes it effectively impossible for a spiritual advisor to be present alongside an inmate during an execution.

261.    The firing squad makes it effectively impossible for a spiritual advisor to lay hands on an inmate during an execution.

262.    The firing squad makes it effectively impossible for a spiritual advisor to engage in audible prayer with an inmate during an execution.

263.    It is prohibitively dangerous for a spiritual advisor to be physically present beside an inmate while he is shot to death.

264.    Mr. Pizzuto will not ask a spiritual advisor to take on that risk.

265.    Mr. Creech will not ask a spiritual advisor to take on that risk.

266.    Because lethal injection allows for the religious exercise described above, and because the firing squad does not, HB 37 imposes a substantial burden on religious exercise.

COMPLAINT - Page 34

**5.    HB 37 is not the least restrictive means of furthering a compelling governmental interest.**

267.   Because HB 37 imposes a substantial burden on religious exercise, it must be the least restrictive means of furthering a compelling governmental interest under RLUIPA.

268.   One governmental interest identified by the proponents of HB 37 was that the firing squad would generate less litigation.

269.   The desire to reduce litigation is not a compelling governmental interest when it is entirely speculative. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021).

270.   It was entirely speculative for the proponents of HB 37 to believe that the firing squad would produce less litigation than lethal injection.

271.   If anything, legislators had every reason to be more concerned about firing squad litigation than lethal injection litigation.

272.   Lethal injection is the primary method of execution in the vast majority of states that actively use capital punishment.

273.   A substantial majority of executions from the modern era in the United States have used lethal injection.

274.   More than 1,000 lethal injection executions have taken place in the modern era in the United States.

275.   Lethal injection protocols have survived the overwhelming number of legal challenges directed at them.

276.   Idaho has chosen a one-drug pentobarbital cocktail.

COMPLAINT - Page 35

277. In 2020, the U.S. Supreme Court upheld a one-drug pentobarbital cocktail in the face of a sophisticated challenge based on extensive expert evidence. *See Barr v. Lee*, 591 U.S. 979 (2020).

278. The Ninth Circuit has never granted relief to an inmate on a challenge to a one-drug pentobarbital cocktail.

279. This Court has never granted relief to an inmate on a challenge to a one-drug pentobarbital cocktail.

280. By contrast with lethal injection, the firing squad has been virtually untested by Eighth Amendment challenges for the last 140 years.

281. As noted above, only six inmates have been executed by firing squad in the modern era.

282. All six of those inmates chose the firing squad.

283. There has accordingly been very little precedent from the last 140 years on an Eighth Amendment challenge to the firing squad.

284. It was wholly speculative for the proponents of HB 37 to believe that the precedent from 140 years ago—*Wilkerson v. Utah*, 99 U.S. 130 (1878)—would spare the firing squad from serious litigation in 2025.

285. *Wilkerson* was decided before the Supreme Court tethered the Eighth Amendment to the evolving standards of decency.

286. *Wilkerson* was decided at a time when firing squad executions were far more common than they are today.

COMPLAINT - Page 36

287.    In *Wilkerson*, the inmate did not allege that the firing squad involved excessive pain and suffering.

288.    In *Wilkerson*, no record was made as to the pain and suffering experienced by an inmate during a firing squad execution.

289.    In *Wilkerson*, no expert testimony was put on as to the pain and suffering experienced by an inmate during a firing squad execution.

290.    In *Wilkerson*, the inmate did not assert any religious challenge to the firing squad.

291.    In *Wilkerson*, the Court did not resolve any religious challenges to the firing squad.

292.    Based on the above, the proponents of HB 37 could not reasonably have believed that *Wilkerson* would preclude litigation over the firing squad today.

293.    At a minimum, it certainly would not have been reasonable for the proponents of HB 37 to believe that *Wilkerson* signified that the firing squad was less susceptible to litigation than a one-drug pentobarbital cocktail, since that method was upheld by the Supreme Court only five years ago in light of far more contemporary evidence.

294.    The interest in avoiding litigation through HB 37 is made even more speculative by the nature of the firing squad technology suggested by the bill's proponents.

COMPLAINT - Page 37

295.   Specifically, Representative Bruce Skaug, who introduced HB 37, stated on the floor of the Idaho House on February 6, 2025, that IDOC intended "to do a mechanized version of the firing squad."

296.   The last time a mechanized firing squad was used in America was in Nevada in 1913 in the execution of Andriza Mircovich.

297.   The only time a mechanized firing squad has ever been used in America was in Mr. Mircovich's execution.

298.   When Mr. Mircovich was executed, Nevada used a 1,000 pound machine with three rifles fired by the cutting of three strings.

299.   If IDOC were to use a mechanized firing squad, it would presumably not utilize a 1,000 pound machine with three rifles fired by the cutting of three strings.

300.   One-drug pentobarbital cocktails are used in several states that have been actively executing inmates in recent years, including Missouri and Texas.

301.   In the last five years, Missouri and Texas have collectively executed thirty-eight inmates.

302.   All of those inmates have been executed with one-drug pentobarbital cocktails.

303.   It is implausible for the proponents of HB 37 to believe that it would create less litigation for IDOC to use an execution technology only employed once in American history than for IDOC to use a method used in dozens of executions over the last several years.

COMPLAINT - Page 38

304. It is implausible for the proponents of HB 37 to believe that it would create less litigation for IDOC to use an execution technology last employed more than a hundred years ago than for IDOC to use a method used in dozens of executions over the last several years.

305. Because the connection between HB 37 and a reduction in litigation is wholly speculative, it cannot serve as a compelling governmental interest.

306. Another interest asserted by the proponents of HB 37 was the avoidance of another unsuccessful execution similar to the botched attempt against Mr. Creech in February 2024.

307. The plaintiffs concede that the desire to avoid a botched execution is a compelling governmental interest.

308. However, HB 37 is not the least restrictive means of furthering that compelling governmental interest.

309. During the February 2024 execution attempt of Mr. Creech, IDOC only tried to obtain peripheral IV access.

310. During the February 2024 execution attempt, IDOC did not attempt to place a central line.

311. A central line involves gaining access to one of the major veins in an individual's body instead of the peripheral veins in the person's extremities.

312. In other states, the central line has been used after peripheral IV access attempts have failed.

COMPLAINT - Page 39

313.    At the time of the February 2024 execution attempt, IDOC's protocol allowed for the use of a central line in the alternative to a peripheral line.

314.    After the February 2024 execution attempt, IDOC added detail to the provisions in its protocol concerning the central line.

315.    Under the revised protocol, which is in effect now, the central line is— if used—placed in the same room where the peripheral IV would otherwise be placed.

316.    Pursuant to that same protocol, the inmate is—after the placement of the central line—moved to the execution chamber.

317.    After the inmate is moved to the execution chamber, the drugs are administered through the central line in the same way that they would be if peripheral lines had been placed.

318.    There is nothing about a central line execution that would prevent a spiritual advisor from remaining in the chamber for the inmate's death.

319.    There is nothing about a central line execution that would prevent a spiritual advisor from laying hands on the inmate during his death.

320.    There is nothing about a central line execution that would prevent a spiritual advisor from praying audibly with the inmate at the time of his death.

321.    There is nothing about the central line that places it on a different footing than the peripheral line with respect to the three preceding paragraphs.

322.    Spiritual advisors have been in execution chambers when the central line has been used.

COMPLAINT - Page 40

323.   Because the central line is designed to address the issue that arose during Mr. Creech's failed execution attempt in February 2024, and because the central line would allow for the religious exercise at issue, it is the least restrictive means of furthering this legislative goal.

324.   To the extent HB 37 was motivated by a more general view that firing squad executions are less susceptible to botches than lethal injection, the legislation was not the least restrictive means of advancing that aim.

325.   Instead, the least restrictive means would be enacting legislation that affords an inmate a choice between lethal injection and the firing squad.

326.   In that event, an inmate would be unable to challenge reliability issues with lethal injection and yet the State would not be impairing any religious rights in so extreme a way as is done by the mandatory firing squad.

327.   Since the firing squad is not the least restrictive means of furthering that goal, and since there is no other compelling governmental interest in play, HB 37 violates RLUIPA.

**C.     Claim Three—HB 37 violates the First Amendment.**

328.   Each and every statement and allegation set forth above is incorporated here as if fully rewritten.

329.   The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const., amend. I.

330.   The First Amendment has been incorporated against the States by the Due Process Clause in the Fourteenth Amendment.

COMPLAINT - Page 41

331. Under current precedent, neutral laws of general applicability are generally immune from Free Exercise challenges. *See Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990).

332. However, prior to *Smith*, the rule was that a law imposing a substantial burden on the exercise of religion had to be narrowly tailored to serve a compelling interest. *See Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972).

333. *Smith* was wrongly decided and should be overruled. *See Fulton*, 593 U.S. 522 at 544–618 (Alito, J., concurring).

334. If *Smith* were overruled and the *Yoder* test reactivated, HB 37 would violate the Free Exercise clause.

335. For the reasons stated above, HB 37 imposes a substantial burden on the plaintiffs' exercise of religion. *See supra* at Part VI.B.4.

336. For the reasons stated above, HB 37 is not narrowly tailored to serve a compelling interest. *See supra* at Part VI.B.5.

## VII. Prayer for Relief

337. In light of the above, the plaintiffs respectfully request that the Court:

    a)    Declare that HB 37 is unconstitutional;

    b)    Enjoin the defendants from proceeding toward and carrying out an execution of the plaintiffs by firing squad;

    c)    Declare that any execution of the plaintiffs by firing squad is unconstitutional;

COMPLAINT - Page 42

      d)      Enjoin the defendants from attempting to execute the plaintiffs until the Court orders otherwise;

      e)      Grant any such other relief that is just and proper.

DATED this 12th day of January 2026.

> _/s/ Jonah J. Horwitz_
> Jonah J. Horwitz
> Mary E. Spears
> Federal Defender Services of Idaho
>
> _Attorneys for Plaintiffs_

COMPLAINT - Page 43